IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 3, 2008 Session

**STATE OF TENNESSEE v. STANLEY BLUE**

**Appeal from the Criminal Court for Shelby County**
**No. 04-02312      James C. Beasley, Jr., Judge**

---

**No. W2007-00292-CCA-R3-CD  - Filed March 19, 2009**

---

The defendant, Stanley Blue, was convicted by a Shelby County jury of facilitation of premeditated first degree murder, attempted second degree murder, and reckless endangerment. The trial court imposed sentences of thirty-four years, fifteen years and six years, respectively; the trial court also ordered the thirty-four-year sentence to be served consecutively to the six-year sentence for a total effective sentence of forty years. In this appeal as of right, the defendant contends that (1) the trial court erred in allowing the State to define premeditated murder and felony murder during voir dire, (2) the trial court erred in denying an excusal for cause of a juror, (3) the trial court erred in its instructions regarding facilitation, (4) the trial court erred by excluding expert testimony, and (5) the evidence is insufficient to support a conviction for attempted second degree murder. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P.  3 Appeal as of Right;  Judgments of the Criminal Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

James E. Thomas (at trial and on appeal); and Juni Ganguli (at trial) Memphis, Tennessee, attorneys for appellant, Stanley Blue.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; Reginald Henderson, Paul Hagerman, and Ray Lepone, Assistant District Attorneys General, attorneys for appellee, State of Tennessee.

**OPINION**

The defendant's convictions arose from the March 11, 2003 slaying of Mareco Robinson and wounding of Jessie Lewis at a Memphis restaurant, Brown's Barbecue. Toya Sanders testified that she and Robinson were childhood friends. She recalled that she saw Robinson at a club, the Hard Luck Café, on the night of March 11, 2003, and that everyone there was "[h]aving a good time." She

admitted that she had smoked some marijuana that night but said that she did not drink. She stated that the defendant, whom she had known since childhood as "Puff," was also at the club that night. She saw the defendant and another male, whom she later learned through the course of the investigation was Eddie Partee, leaving the club in a Cadillac. After leaving the club at approximately 3:00 a.m., Sanders and her friends decided to go to Brown's Barbecue to get something to eat. When they arrived at Brown's Barbecue, the defendant and Partee were already at the restaurant. Soon after she and her friends arrived, Robinson arrived at the restaurant.

Sanders testified that the defendant went out to his car while Partee waited in line for his order. She recalled that Robinson and Partee exchanged words about Robinson's order while waiting in line. Robinson went outside to his car and Partee followed him but went to the defendant's vehicle where Sanders witnessed Partee and the defendant talking. When Robinson returned to the restaurant, Partee and the defendant followed him. While the defendant went to the bathroom, Partee pulled a gun and shot Robinson in the back of the head. As soon as Partee shot Robinson, the defendant came out of the bathroom shooting "a little old bitty gun." Everyone fled the restaurant for safety. Sanders saw Partee and the defendant leave the restaurant, get into the Cadillac and flee the scene.

Sanders testified that as everyone was leaving the restaurant, Jessie Lewis was walking in. She said that Partee and the defendant shot Lewis as he was entering the restaurant. She stated that as the men returned, she "was trying to get everybody out" because she could tell that something was about to happen when the men went outside to the parking lot. Sanders testified that she never saw Robinson threaten or display a weapon to either the defendant or Partee, but she also admitted that she could not see whether Robinson retrieved anything from his car while he was outside listening to music with his hood up.

Jessie Lewis testified that he spoke with Robinson at Brown's Barbecue on the night of March 11, 2003. He recalled Robinson telling him that "something was wrong with [Partee]." Before Robinson could explain to Lewis what he meant, Partee entered the restaurant and shot him. Lewis had turned his back to Robinson but upon hearing the shot, he turned around and saw Partee standing over Robinson holding the gun. Lewis stated that the defendant walked from the bathroom and fired two more shots toward Robinson as he lay on the ground. Lewis recalled that everyone except him had left the restaurant with the firing of the first shot. He said that he was standing at the door "so shocked, [he] couldn't go nowhere [sic]" when the defendant came from the bathroom. The defendant and Partee walked to the front door and saw Lewis. The defendant then "bumped Partee in the back," and Partee "looked at [Lewis] and kicked the door open and shot [him]." Lewis was shot in the groin with the bullet exiting through his hip. He saw the defendant and Partee leave in the Cadillac with Partee driving. Lewis later identified the defendant as one of the individuals involved in the shooting. Lewis also stated that he did not see Robinson with a gun.

Kevia Taylor testified that she was with her cousin, Toya Sanders, at Brown's Barbecue on March 11, 2003. Her testimony was consistent with Sanders' testimony regarding the events leading up to the shooting. She witnessed Partee go to a vehicle, retrieve a pistol and load it before returning to the restaurant. She recalled that the defendant looked at Partee as they returned to the restaurant and she took that as a signal between the two men. Taylor stated that she "knew something was

fixing to go down" so she started to leave the restaurant. As she was leaving, she heard the gunshots. She ran behind a building and did not see the defendant or Partee leave. Afterwards, she saw that Lewis had been shot as well as Robinson. Taylor later identified the defendant from a photographic lineup. Taylor admitted that she saw Robinson open the hood of his car and go to his trunk, but she could not see whether he got anything from the trunk before returning to the restaurant.

Memphis Police Department Officer Kimberly Houston testified that she responded to the scene of the shooting at Brown's Barbecue on March 11, 2003. When she arrived, she observed a black male on the floor suffering from a gunshot wound to the head and another black male sitting on a bench who had been shot in the leg. The man with the wound to the head was alive and conscious. She recalled that he was mumbling as if attempting to say something but that she could not understand him. She tried to calm him and tell him to stop talking; as she heard the ambulance approach, she looked to discover that he was no longer breathing. When the paramedics arrived, the man with the wound to his leg was treated and taken to the hospital by ambulance. Officer Houston stayed at the scene until the deceased victim was removed. Officer Houston also testified that she secured witnesses at the scene until more officers arrived to get information and statements from them.

Memphis Police Department Lieutenant Daniel Parris testified that he was assigned to the crime scene unit at the time of the offenses. He related that his general duties consisted of documenting the facts and physical evidence of a crime scene through photographs, sketches, and recovered evidence. Lieutenant Parris sketched the crime scene at Brown's Barbecue. He documented eight items at the scene, including blood, a spent bullet, bullet holes and strikes, and two forty caliber shell casings.

Kcbena Cash of the Memphis Police Department testified that the defendant was developed as a suspect in the shootings within a week of the incident. After a warrant was issued for the defendant's arrest, Officer Cash began to look for the defendant. After Officer Cash talked to several family members and acquaintances of the defendant, the defendant telephoned Officer Cash himself. She explained to the defendant that there was a warrant issued for him and asked him to come in voluntarily. She recalled that the defendant did not agree to turn himself in. As she continued her efforts to locate the defendant, she spoke with the defendant daily on the telephone. She recalled that he always contacted her on private numbers. She testified that each time they talked "[t]he gist of the conversation was to turn himself in." Eventually, Officer Cash received a phone call or "tip" that led her to a possible location of the defendant. Upon arrival at the residence, the defendant was gone but a forty caliber handgun was discovered and taken into property at the Memphis Police Department. Eventually, Officer Cash received another tip regarding the defendant's whereabouts at a different residence and he was apprehended there while trying to escape from a window. Additionally, another handgun and forty caliber ammunition were found at the residence. On cross-examination, Officer Cash admitted that the defendant was not found at the first residence searched and that no one knew who left the forty caliber handgun at the residence.

Sergeant William D. Merritt of the Memphis Police Department testified that he acted as the case coordinator on the defendant's case. As part of his duties as the case coordinator, he sent items to the Tennessee Bureau of Investigation (TBI) for testing. Sergeant Merritt sent a Keltec forty

caliber handgun, two forty caliber shell casings, one bullet projectile, and a Ruger nine millimeter semi-automatic to the TBI for analysis. Sergeant Merritt testified that the Ruger was recovered near a dumpster outside the restaurant. He further stated that his investigation revealed that Mario Broadnax had taken the Ruger from the victim and placed it near the dumpster.

TBI Special Agent Steve Scott testified as a firearms identification expert. After identifying the items submitted by Sergeant Merritt, Special Agent Scott determined that the spent cartridges and bullet recovered at the scene had been fired by the Keltec handgun. Testing of the Ruger pistol revealed that it would eject a shell casing much like the Keltec; however, no shell casings matching the Ruger were discovered at the scene. Special Agent Scott stated that the forty caliber bullet recovered from the victim's body was fired from a revolver – either a Smith and Wesson Special Revolver or a Remington Magnum Revolver – and not a semi-automatic pistol like the Keltec or Ruger. The gun that fired the bullet recovered from the victim was not presented to the TBI for testing.

Dr. O'Brian Smith testified that he was the Shelby County Medical Examiner at the time of the shooting and that he performed the autopsy on the victim and determined that he suffered a gunshot wound to the right side of his head behind his ear that produced brain damage before the bullet came to rest in the front portion of the victim's brain. Toxicology testing of the victim's blood revealed a .203 grams percent blood alcohol content which Dr. Smith characterized as "moderately elevated." Toxicology testing revealed no presence of drugs. Dr. Smith testified that the cause of death was a gunshot wound to the head and opined that "in most instances, this bullet . . . wound would have a lethal outcome."

The State presented the prior sworn testimony of Mario Broadnax which was read to the jury by a court reporter.[1] Broadnax testified that he had been at the Hard Luck Café on the night of the incident and that he had not been drinking that night, although he did admit to smoking one or two marijuana cigarettes earlier in the evening. He went to Brown's Barbecue after leaving the club and recalled seeing the victim there when he arrived. He could tell that the victim and some other men were arguing and he saw "one or two people" go inside the restaurant with guns. Broadnax testified that when he heard gunshots he ran to the back of the building. When he returned to the front of the parking lot, he discovered the surviving victim, Jessie Lewis, lying on the ground with a gunshot wound. He ran inside to check on the other victim, Mareco Robinson, who was still breathing. He told the employees to call the police.

Broadnax stated that another witness indicated to him that the victim had a weapon so he returned to the victim, removed the gun from the victim's belt, and hid it behind the restaurant.

---

[1] Rachel Geiser testified out of the jury's presence that she was an employee with Inquisitor, Inc., a Memphis-based private investigation firm. She related that she had been unable to locate Broadnax in her efforts to subpoena him for trial. The trial court found Broadnax to be an unavailable witness pursuant to Rule 804(a)(5) of the Tennessee Rules of Evidence and allowed his testimony from the first trial that ended in a mistrial to be read into evidence pursuant to Rule 804(b)(1) without objection by the defendant except for some discussion regarding who would read the prior testimony in order to avoid any inappropriate emphasis. The trial court determined that a court reporter should read the testimony to the jury.

Other witnesses told the police that Broadnax removed the gun so, several days later, he led the police to the location of the gun. He explained that he removed the gun because he "felt that if [the police] came and found a gun on [the victim], you know, that they probably wouldn't, you know, try to find out who did it." Broadnax identified the defendant as one of the people he saw at the restaurant that night. He also stated that he removed the gun from underneath the victim's shirt. He admitted on cross-examination that he could not see who fired the shots because he ran behind the building when the shooting began. After the reading of Broadnax's testimony, the State rested its case-in-chief.

The defendant presented the testimony of Daryl Powell, who stated that he was at Brown's Barbecue on the night of the shooting. He recalled that he was there sleeping but that he "wasn't supposed to be" there. He said that he was asleep in a booth when the argument between the victim and the other men woke him up. He said that he knew the victim by his neighborhood nickname of "C-Murder." He saw the victim go to his car and return to the restaurant with a black gun in his hand. He testified that everyone in the restaurant "just went hysterical" and the shooting began. He did not know the man who shot the victim. He reiterated that he saw a gun in the victim's hand when the shooting occurred. He testified that when one person shot the victim he just dropped and then another individual began shooting as well. He saw the two shooters leave the scene in a Cadillac. On cross-examination, Powell was confronted with his statement to police that failed to mention the presence of the victim's gun. He explained that maybe the police did not write that down and that he did not want "to be in everybody else's business" but that he definitely saw the victim with a gun.

Calandra Shaw testified that she was working at Brown's Barbecue on the night of the shooting. She had worked at the restaurant for about fifteen years and knew the victim, "Reco," as a regular customer. She recalled that Reco and another man argued at the front counter for about ten minutes. She recalled that the other man left the restaurant and, about ten minutes later, she heard shooting. Shaw testified that she crawled to lock the door so no one else would come inside during the shooting. She stated that she heard a quick series of gunshots. When the shooting ended, she stood up to see the victim fall to the floor. She saw a man in a yellow shirt remove a gun from the victim's pocket. On cross-examination, she stated that she did not see the victim get shot, but she did see him fall to the ground after being shot.

Memphis Police Department Officer Danny James testified that he worked as a crime scene officer at the time of the shooting. He stated that he photographed the location of a gun found on the steps outside the restaurant.

ANALYSIS

*State's Comments During Jury Selection*

In his first allegation of error, the defendant argues that the trial court erred in allowing the State to define the elements of premeditated murder and felony murder to potential jurors during jury selection. The defendant contends that the State's discussion of the differences between premeditated murder and felony murder and the additional definition of criminal responsibility was

confusing and misleading. The State contends that the comments were made in an effort to ensure that the prospective jurors understood the law applicable to the case. Furthermore, the State notes that the statements were an accurate statement of the law and the trial court properly instructed the jury prior to deliberations.

The record reflects that the defendant objected to the State defining premeditated murder during voir dire on the basis that it was the trial court's "job to tell [jurors] that." The trial court overruled the objection stating that the State "has a right to explore [the jurors'] thoughts and understanding. Obviously, I'm going to give them the law but I think it's proper voir dire." When a juror described planning a robbery during which someone gets killed, the State explained felony murder to note the difference between those facts and those of a typical premeditated murder as charged in this case. The defendant objected based upon relevancy. The trial court overruled the objection, reasoning that the concept of felony murder was raised by the juror's comment and appropriate "to explore with [the juror] the differences in the two [types of first degree murder]." Later, the State defined criminal responsibility to the jurors, tracking the language found in Tennessee Pattern Jury Instructions 3.01. Despite the defendant's challenging this comment on appeal, we are unable to find any contemporaneous objection in the record before us.

"The ultimate goal of voir dire is to [e]nsure that jurors are competent, unbiased, and impartial." State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994). Decisions regarding the conduct of voir dire are left to the sound discretion of the trial court and we will not reverse the trial court's action absent a showing of an abuse of that discretion. Id. With these principles in mind, we are unable to conclude that the trial court abused its discretion in allowing the State to explain the elements of first degree murder and criminal responsibility during voir dire. It is clear from the record that the State's comments were made to ensure that each juror understood the law applicable to the case. Furthermore, not only were the comments an accurate statement of the law, the trial court appropriately instructed the jury regarding these concepts before deliberations. For these reasons, we conclude that this issue is without merit.

*Dismissal of Juror for Cause*

Next, the defendant contends that the trial court erred in failing to discharge a juror on the third day of trial based upon the juror's realization that he knew one of the State's witnesses, Sergeant Merritt. The defendant argues that the trial court should have excused this juror and replaced him with one of the alternates. The State contends that the defendant has failed to establish that the juror should have been excused based upon a casual acquaintance with a witness.

"Once a jury is impaneled, jurors may be discharged from further service prior to deliberations only if found by the trial court to be 'unable or disqualified to perform their duties.'" State v. Cleveland, 959 S.W.2d 548, 551 (Tenn. 1997) (quoting Tenn. R. Crim. P. 24(e) (now Tenn. R. Crim. P. 24(f)(2)(B))). Furthermore, "[w]here a juror is not legally disqualified or there is no inherent prejudice, the burden is on the Defendant to show that a juror is in some way biased or prejudiced." State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993).

-6-

Our review of the record reveals no transcript of any contemporaneous objection or motion to excuse the juror either during or immediately after the witness testified. The first reference to any motion regarding disqualification of the juror is found after the trial court instructed the jury and contains no argument or discussion of what actually transpired at the time the witness testified. The discussion merely relates to a renewed motion to disqualify that the trial court overruled stating, "I don't see a problem with his service. I will note your objection and your request." At the motion for new trial hearing, the State indicated that the juror's son played soccer with the witness's son and that, upon inquiry of the trial court, the juror stated that he would not have a problem fulfilling his duty as a juror. In denying this as a basis for new trial, the trial court stated that the juror's acquaintance with the witness

> d[id] not develop a relationship such that [the juror] indicated that he could not be fair and could not judge [the witness's] testimony for whatever weight and credit he wanted to give it. . . . [T]here was absolutely no basis for [the trial court] excusing [the juror] from serving just because he recognized and had known in some form or fashion, obviously very remote, one of the witnesses who testified in the case.

In light of both the trial court's findings and the absence of any transcript reflecting the actual inquiry of the juror, we conclude that the defendant has failed to meet his burden to show that the juror was biased in such as way as to require disqualification. Accordingly, this issue is without merit.

*Sufficiency of Instructions on Facilitation*

The defendant contends that the trial court erred in failing to include instructions on each count of facilitation as a lesser included offense within sequential order throughout the jury instructions. The State counters that although the trial court refused the defendant's request to instruct the jury on facilitation in sequential order following each lesser included offense, the instruction was not misleading and the jury was properly instructed.

A criminal defendant has the right to a complete and accurate charge of the law given to the jury by the trial court. State v. Stephenson, 878 S.W.2d 530, 555 (Tenn. 1994). For the purposes of determining whether a defendant has been afforded that right, the jury charge should be "viewed in its entirety" and "considered as a whole." Id. (citing Otis v. Cambridge Mutual Fire Insurance Co., 850 S.W.2d 439, 446 (Tenn. 1992)). Therefore, this court's inquiry must be whether the trial court's definition of facilitation at the opening of the jury instruction, without sequential repetition throughout, resulted in a failure to accurately and completely charge the law or mislead the jury.

The record reflects that the defendant requested that the trial court instruct facilitation relative to each lesser included offense in sequential order throughout the instructions. The trial court noted the request but ruled that a single instruction regarding facilitation would be given, relative to all charged and lesser included offenses, and that the verdict form would specifically list each offense and its lesser included offenses (including facilitation) in sequential order. Prior to instructing the jury regarding the relative elements of each offense and its lesser included offenses, the trial court explained each count charged in the indictment including the applicable lesser included offenses.

The trial court then proceeded to instruct the jury relative to facilitation generally before giving more specific instructions regarding each offense and its lesser included offenses. The verdict form correctly outlines the sequential order of consideration. We further note that the jury convicted the defendant of facilitation of premeditated murder and attempted second degree murder which was listed sequentially below facilitation; the jury obviously considered facilitation appropriately. Therefore, we conclude that the jury instructions were neither erroneous nor misleading and that the defendant's issue is without merit.

*Exclusion of Expert Testimony*

The defendant contends that the trial court erred in excluding the expert testimony of Dr. Joseph Angelillo, a forensic psychologist, to prove that the defendant suffered from a mental disease or defect rendering "him incapable of forming the intent to commit First Degree Premeditated Murder and the other crimes for which he was indicted." The State contends that the trial court properly excluded the proffered testimony because Dr. Angellilo was unable to conclusively state that the defendant suffered from a mental disease or defect, rather than exhibiting symptoms of some mental illness, and that Dr. Angellilo was also unable to state that any of the defendant's symptoms of mental illness rendered him incapable of forming the requisite mental state. Following our review, we agree with the State.

Our appellate courts have "concluded that a defendant's capacity to form the requisite mental state to commit an offense is an issue in criminal prosecutions because the general criminal law in Tennessee provides that '[n]o person may be convicted of an offense unless . . . [t]he culpable mental state required is proven beyond a reasonable doubt.'" State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997) (internal citation omitted). Furthermore, "the negation of an element of a criminal offense is recognized as a defense in Tennessee." Id. (citation omitted). In Hall, our supreme court held that psychiatric evidence that the defendant lacked the capacity to form the requisite mental state for an offense

> must satisfy the general relevancy standards as well as the evidentiary rules which specifically govern expert testimony. Assuming that those standards are satisfied, psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law.

Id.; see also State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994) ("While the law presumes sanity it does not presume mens rea. Due process requires that the government prove every element of an offense beyond a reasonable doubt.").

Tennessee Rule of Evidence 401 broadly provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger

of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Regarding expert testimony, an expert may testify "in the form of an opinion or otherwise" when the "scientific, technical, or other specialized knowledge" offered by the witness will "substantially assist" the trier of fact. Tenn. R. Evid. 702. The expert's opinion must be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Tenn. R. Evid. 703. The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion *on the subject at issue*." State v. Stevens*,* 78 S.W.3d 817, 834 (Tenn. 2002) (citations omitted). "[Q]uestions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court," and a trial court's ruling on the admissibility of such evidence "may only be overturned [on appeal] if the discretion is arbitrarily exercised or abused." McDaniel v. CSX Transp., Inc.*,* 955 S.W.2d 257, 263-264 (Tenn. 1997).

Dr. Angelillo's testimony was relevant to the defendant's ability to form the requisite culpable mental state. However, this court has concluded that "our supreme court specifically stated that the admissibility of an expert's testimony regarding a defendant's diminished capacity requires a showing (1) that the defendant 'lacked the capacity' to form the culpable mental state and (2) that he lacked the capacity due to a mental disease or defect." State v. Antonio D. Idellfonso-Diaz, No. M2006-00203-CCA-R9-CD, slip op. at 4 (Tenn. Crim. App. Nov. 1, 2006) (emphasis added), app. denied, (Tenn. Feb. 26, 2007). Dr. Angelillo initially testified that the defendant suffered from a delusional disorder as well as "features of" both schizotypal and paranoid personality disorders. He also stated that these mental impairments would "affect his planning, which goes to his ability to formulate intent." However, when asked by the State whether the defendant could not form premeditation, Dr. Angelillo responded:

> No, sir. I didn't testify to that. I said that it would be – there are aspects of his ability to think and plan that would be affected by this disorder. I clearly said I'm not going to sit here and say that he cannot formulate intent.

When questioned further by the trial court, Dr. Angelillo reiterated that "I can only tell you as a psychologist the areas that [the mental impairments] impact[] are his ability to plan and think on a mature level. But I'm not saying that he can't [premeditate]." The holding in Hall requires that the defendant's mental disease or defect render the defendant unable to form the requisite mental state; evidence that the defendant's mental disease or defect "impaired or reduced" the defendant's ability to form the requisite mental state does not satisfy the Hall standard. See id., slip op. at 4-5. Accordingly, we conclude that the trial court did not abuse its discretion in excluding Dr. Angelillo's testimony.

*Sufficiency of the Evidence*

As his final allegation of error, the defendant argues that the evidence is insufficient to support his conviction for attempted second degree murder. He contends that because the proof showed that he had already exited the restaurant at the time Partee shot Lewis, "no rational trier of fact could have found [him] criminally responsible" for attempted second degree murder. The State

contends that the evidence is sufficient in light of proof that the defendant nudged Partee in order to alert him to remove Lewis from the doorway so that the men could flee the scene. Following our review, we agree with the State.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Second degree murder is statutorily defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). A person attempts to commit second degree murder when he or she acts with intent to knowingly kill the victim and believes his or her conduct will cause the victim's death without further conduct on the person's part. Tenn. Code Ann. § 39-12-101(a)(2). Tennessee Code Annotated section 39-11-402(2) provides that a defendant is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense[.]" A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both. Tenn. Code Ann. § 39-11-401(a). "Each party to an offense may be charged with commission of the offense." Tenn. Code Ann. § 39-11-401(b).

The proof at trial established that Lewis heard a gunshot and saw Partee standing over Robinson holding a gun. Soon thereafter, the defendant walked from the bathroom and fired two more shots toward Robinson as he lay on the ground. Lewis testified that he stood at the doorway "so shocked, [he] couldn't go nowhere [sic]" when the defendant came from the bathroom. As the defendant and Partee walked to the front door to leave the scene, the defendant "bumped Partee in the back," alerting Partee to Lewis's presence. Partee then kicked the door open and shot Lewis on the way out of the restaurant. Lewis suffered a gunshot wound to the groin that exited through his hip. We conclude that the evidence is sufficient to convict the defendant of attempted second degree murder.

## CONCLUSION

Upon full consideration of the record and arguments of counsel, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE